UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NATHAN G. FLEMMING,                )
                                   )
        Petitioner,                )
                                   )
v.                                 )        No. 3:23-CV-00356-JRG-DCP
                                   )
CHRIS BRUN,                        )
                                   )
        Respondent.                )

## MEMORANDUM OPINION

Petitioner Nathan G. Flemming is a Tennessee inmate proceeding pro se on a federal habeas petition under 28 U.S.C. § 2254 in which he challenges the constitutionality of his confinement under Knox County judgments of conviction for two counts of aggravated robbery, two counts of attempted first-degree murder, four counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, and two counts of especially aggravated kidnapping, for which he received an effective sixty-eight-year sentence [Doc. 1]. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court will not hold an evidentiary hearing[1], the petition will be **DENIED**, and this action will be **DISMISSED**.

## I.      SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

A Knox County Grand Jury indicted Petitioner on two counts of especially aggravated kidnapping of Derek Marsh, two counts of aggravated robbery of Mr. Marsh, two counts of

---

[1] "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules"); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (providing an evidentiary hearing not required where record refutes the petitioner's allegations or otherwise precludes habeas relief).

attempted first-degree murder of James Daniels, two counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, two counts of employing a firearm during the commission of a carjacking, and two counts of especially aggravated robbery of Mateo Gaspar [Doc. 13-1 at 8–13]. The Tennessee Court of Criminal Appeals ("TCCA") recounted the proof presented at Petitioner's trial as follows:

> [O]n December 26, 2013, the [Petitioner] arrange[d] to purchase marijuana at the home of Mr. Derek Marsh and Mr. James Daniels. Instead, the [Petitioner] produced a gun, held Mr. Marsh at gunpoint, and took Mr. Marsh's gun from him. During the course of the robbery, Mr. Marsh was able to escape, but the [Petitioner] shot Mr. Daniels multiple times. When the [Petitioner] left the home, he approached Mr. Mateo Gaspar, who was in his SUV, shot Mr. Gaspar twice, and drove away in the SUV.
>
> Mr. Daniels testified that he, Mr. Marsh, Mr. Rocky Carson, and Mr. Brandon Coleman were inside the home when the [Petitioner] initially produced the gun. Mr. Daniels had learned earlier in the day that the [Petitioner] and Mr. Carson were coming to the home, and Mr. Daniels believed that the [Petitioner] and Mr. Marsh were going to purchase marijuana from Mr. Carson. Mr. Daniels said that the [Petitioner] arrived in a white or gray car, that multiple people were inside the car, and that the [Petitioner] was sitting in the backseat. The car parked in a space behind the home, and the [Petitioner] entered through the back door. He sat on the couch in the living room where he and Mr. Daniels talked for five to fifteen minutes until Mr. Marsh, Mr. Coleman, and Mr. Carson arrived.
>
> After everyone arrived, the [Petitioner] went outside, stating that he needed to get money from his brother, who was in the car. When he returned, Mr. Daniels and Mr. Carson were in the living room; Mr. Coleman was using the computer; and Mr. Marsh, who had a gun on his hip, was in the kitchen and near the back door. Mr. Carson had a container of marijuana and scales on a table in the living room and additional marijuana on his person.
>
> Mr. Daniels testified that the [Petitioner] reentered the home with a gun and "rack[ed]" the gun. Mr. Coleman and Mr. Carson ran out of the house through the front door. Mr. Daniels said he was about to flee when he realized that Mr. Marsh was still in the kitchen. Mr. Daniels took a pocket knife out of his pocket and walked toward the kitchen. He walked around a corner where he saw Mr. Marsh with his hands up. The [Petitioner] was holding a gun to the back of Mr. Marsh's head, and it appeared as if the [Petitioner] was pushing Mr. Marsh with the gun. Mr. Daniels realized that he would be unable to stop the [Petitioner] with a pocket knife, and he dropped the knife and put his hands up.

2

Mr. Daniels stated that the [Petitioner] pushed the gun against his chest and fired it. Mr. Daniels grabbed the gun and wrestled the [Petitioner] over the gun while Mr. Marsh escaped through the front door. The [Petitioner] shot Mr. Daniels in his side, and Mr. Daniels fell on his back. The [Petitioner] stepped over Mr. Daniels and entered the living room. He then returned and shot Mr. Daniels several more times with a different gun. The [Petitioner] stood at Mr. Daniels's feet and shot straight down at him. One shot hit Mr. Daniels's stomach; another shot grazed his upper chest; and one shot hit Mr. Daniels's spinal column, after which "everything just went kind of blank." Once Mr. Daniels regained consciousness, he realized that a bullet had passed through his left shoulder blade. He was able to retrieve his cell phone and call 911. After he told the operator his address, he dropped his cell phone, and the battery fell out. He inserted the battery, and the operator called him back. By that time, Mr. Marsh had returned to the home and spoke to the 911 operator.

Mr. Daniels testified that he remained hospitalized for two months. He spoke to police officers while he was hospitalized, and on January 9, 2014, he identified the [Petitioner] as the shooter in a photographic lineup. Mr. Daniels was shot six times and had multiple infections due to his injuries. His spleen, left kidney, fifteen feet of intestines, and half of his left lung had to be removed as a result of injuries sustained from the gunshots. He had a hole in his colon, as well as holes "in a bunch of other stuff," sustained multiple broken ribs, and had two bullets lodged in his spinal column. Because he was missing a large portion of his intestine, he was unable to properly absorb nutrients, and his teeth began decaying and falling out. All of his teeth had to be pulled as a result. On cross-examination, Mr. Daniels testified that Mr. Marsh's gun was still on his hip when Mr. Daniels saw the [Petitioner] "rack" his gun upon reentering the home.

Mr. Marsh testified that on the day of the shooting, he and Mr. Coleman recorded a music video and returned to Mr. Marsh's home to edit the recording. Mr. Daniels, Mr. Carson, and the [Petitioner], whom Mr. Marsh had met on one prior occasion, were at the home. At one point, the [Petitioner] said he was going outside and exited the home through the back door in the kitchen. At the same time, Mr. Marsh went into the kitchen to make a telephone call. Mr. Marsh stated that he saw the [Petitioner] reenter the home and heard a gun "cock." The [Petitioner] approached Mr. Marsh while holding a gun. Mr. Marsh tried to grab the [Petitioner]'s gun, but the [Petitioner] was able to get away and pointed the gun at the back of Mr. Marsh's head.

Mr. Marsh testified that he had a gun on his hip and that the [Petitioner] took the gun from him when the [Petitioner] put his own gun to Mr. Marsh's head. Mr. Marsh put his hands up when he felt the gun on the back of his head. The [Petitioner] pushed Mr. Marsh out of the kitchen and around a corner into the hallway. Mr. Marsh testified that he saw Mr. Daniels approach, heard a "pop" as Mr. Daniels was being shot, saw Mr. Daniels fall to the floor, and heard two or three more shots. Mr. Marsh then ran out of the home through the front door and hid near a tool shed.

Mr. Marsh testified that while hiding, he heard a series of gunshots fired outside the home, and that an SUV then sped away through the nearby alley. While returning home, Mr. Marsh saw Mr. Gaspar, his neighbor, lying on the ground while bleeding and moaning. Mr. Gaspar's wife and children were outside, and Mr. Marsh instructed them to call 911. Mr. Marsh entered his home and found Mr. Daniels lying in the same spot where he had fallen earlier. Mr. Daniels appeared as if he was "almost dead." His cell phone was on his chest, and the 911 operator was on the line. Mr. Marsh took the cell phone and instructed the operator to send help quickly.

Mr. Marsh testified that he was not entirely truthful with police officers when he spoke to them following the shooting. He originally told officers that his gun was on a counter rather than on his hip. He explained that he was concerned about whether he could legally possess a gun and that he knew that a drug transaction was occurring in the home. He denied seeing marijuana in the home prior to the shooting.

On cross-examination, Mr. Marsh acknowledged that he had a "history with the legal system," which was a reason that he was afraid to tell officers that his gun was on his hip. He said the gun was a .45 caliber handgun, which held six rounds. He believed five or six rounds were in the gun. He denied previously selling drugs to the [Petitioner] and said he met the [Petitioner] through a friend of a friend. Mr. Marsh believed Mr. Carson had arranged the drug transaction. Mr. Marsh denied purchasing drugs from Mr. Carson or arranging drug transactions with Mr. Carson. Mr. Marsh also denied that the [Petitioner] had called him for directions to the home. Mr. Marsh did not know Mr. Coleman's location at the time of trial and said Mr. Carson was deceased.

Mr. Gaspar testified through an interpreter that on the day of the shooting, he, his two daughters, his cousin, and his cousin's son arrived at Mr. Gaspar's home after playing basketball with friends. Mr. Gaspar drove to parking area behind his home and saw car parked behind his neighbor's home. The car drove away when Mr. Gaspar arrived. As Mr. Gaspar was backing his vehicle into his garage, a man came out of the home of Mr. Gaspar's neighbor and opened the door to Mr. Gaspar's vehicle. Mr. Gaspar testified that the man pulled out two guns from his pockets and ordered Mr. Gaspar to give him the keys to the car. When Mr. Gaspar asked "why," the man shot him twice. One bullet grazed Mr. Gaspar's body, and the other bullet entered his arm. Mr. Gaspar's cousin and the children were able to escape from the car and enter the home. Mr. Gaspar said that he "hit the guns" and that both guns fell, with one falling on the floor of the car next to the gas pedal. The man pulled Mr. Gaspar out of the car. The man fled in the car and drove over Mr. Gaspar's foot as he was escaping. Mr. Gaspar stated that a baby stroller and his daughters' two bicycles were in the car when the man drove away.

Mr. Gaspar remained hospitalized for three days. He underwent surgery during which screws were inserted in his arm, and his arm remained in a sling for one month. Due to his injury, he was unable to work following his release from the hospital. On cross-examination, Mr. Gaspar testified that the man fired both guns at him, that the man seemed to be in a hurry to flee, and that the man did not look in Mr. Gaspar's car to see what was in it before driving away.

According to medical records from the University of Tennessee Medical Center, Mr. Gaspar was admitted on December 26 and was discharged on December 30, 2013. Mr. Daniels was admitted on December 26 and was discharged on January 24, 2014. Ms. Barbara Gentry, a trauma core nurse, testified that according to Mr. Daniels's records, he came to the emergency room suffering life-threatening injuries. His heart rate was extremely fast, and a nurse was unable to obtain a blood pressure reading from Mr. Daniels. The doctors chose to send Mr. Daniels directly to the operating room.

Investigator Michael Washam with the Knoxville Police Department testified that he and Investigator Colin McLeod responded to the scene. When they arrived, Mr. Daniels was being loaded into an ambulance, and Mr. Gaspar was being transported to the hospital. Investigator Washam stated that Mr. Daniels's injuries were so extensive that he was unsure that Mr. Daniels would survive. Investigator Washam and Investigator McLeod began identifying and interviewing potential witnesses, including Mr. Marsh and Mr. Coleman. As a result, the [Petitioner] was developed as a suspect.

On the following day, officers located Mr. Gaspar's vehicle and transported it to a secure location for processing. Investigator Washam noted that blood was on the outside of the vehicle where Mr. Gaspar attempted to hang onto the vehicle and that blood also was along the side of the vehicle and on a wheel. Investigator Washam met with Mr. Marsh and had him retrace his steps. He also was able to speak with Mr. Daniels, who confirmed that the [Petitioner] was a suspect. Mr. Daniels identified the [Petitioner] as the shooter in a photographic lineup on January 9, 2014, and Mr. Marsh identified the [Petitioner] as the shooter in a photographic lineup on January 26.

The [Petitioner] was arrested on February 15, and Investigator Washam interviewed the [Petitioner], who waived his rights and agreed to speak to him. The [Petitioner] stated that he had previously been involved in drug transactions with Mr. Marsh and Mr. Marsh's former girlfriend, "Goosie," who was in jail. The [Petitioner] said that on the day of the shooting, he had arranged to purchase one pound of marijuana for approximately $2,000. He also said that he did not have the money and that he brought a gun, intending to rob the dealers of the marijuana.

Investigator Washam testified that Mr. Daniels had stated that he had provided directions for the [Petitioner] and that he had observed a vehicle in which the [Petitioner] appeared to have arrived parked near the home. Investigator Washam

also had a description of the vehicle from multiple witnesses. The [Petitioner], however, told officers that he walked to Mr. Marsh's residence. When officers confronted the [Petitioner] with the inconsistency, he continued to maintain that he walked to the home.

The [Petitioner] told officers that he entered the home through the back door and that he saw Mr. Daniels and Mr. Marsh in the living room and a man with dreadlocks on the computer. The [Petitioner] stated that another man was supposed to deliver the marijuana and that they waited some time for the man, who arrived with a "Tupperware-type" container of marijuana. The [Petitioner] said he needed to make a call, went outside, pulled out his gun, and reentered the home. Mr. Marsh was in the kitchen and saw the [Petitioner] draw back the slide on his gun. The [Petitioner] stated that Mr. Marsh went for a gun that was on his person and that the [Petitioner] shot at Mr. Marsh. Although the [Petitioner] did not know whether he hit Mr. Marsh, the [Petitioner] said Mr. Marsh dropped his gun and moved. The [Petitioner] stated that he pointed his gun at Mr. Marsh while retrieving Mr. Marsh's gun. The [Petitioner] saw Mr. Daniels coming toward him and fired his gun twice at Mr. Daniels. Mr. Daniels fell, and Mr. Marsh ran out of the house.

The [Petitioner] told officers that he walked into the living room and retrieved the container of marijuana. He said that as he was walking back through the home, Mr. Daniels made a movement on the floor, and the [Petitioner] shot Mr. Daniels three more times with Mr. Marsh's gun, a Glock 36 .45-caliber handgun, while Mr. Daniels was lying on the floor. The [Petitioner] then fled from the home.

The [Petitioner] stated that he was in "panic mode" when he saw Mr. Gaspar in his vehicle. The [Petitioner] approached the vehicle and ordered Mr. Gaspar to get out. The [Petitioner] stated that Mr. Gaspar held onto the steering wheel and was "trying to beat on" the [Petitioner]. The [Petitioner] said initially he did not believe he shot Mr. Gaspar but later admitted that he "may have" shot Mr. Gaspar twice. The [Petitioner] stated, "When I'm trying to get him out and I'm beating on him with the gun, yes, I ended up shooting him."

The [Petitioner] did not recall throwing Mr. Marsh's gun from the vehicle and said he thought he took both guns with him when he drove away in Mr. Gaspar's vehicle. While fleeing at a high rate of speed, the [Petitioner] crashed the vehicle and abandoned it at the location where officers later recovered it. The [Petitioner] stated that he took both guns and threw them over a slope to the left of the vehicle. Investigator Washam stated that officers subsequently searched the wooded area where the [Petitioner] said he discarded the guns, and the officers recovered a gun lying underneath some brush.

On cross-examination, Investigator Washam testified that the [Petitioner] stated that he called Mr. Marsh to set up the drug transaction and that he called Mr. Daniels for directions when he was near the home. The [Petitioner] stated that he used his own gun to shoot Mr. Daniels initially, that Mr. Daniels continued to come toward

6

him, and that he shot Mr. Daniels again. The [Petitioner] maintained that he was in a state of "panic" because things were not going as he had hoped. He stated that when he first approached Mr. Gaspar's vehicle, another adult and children were also in the vehicle and that the adult and the children were able to escape from the vehicle. The [Petitioner] admitted to fighting with Mr. Gaspar as Mr. Gaspar gripped the steering wheel and to striking Mr. Gaspar with a gun. Investigator Washam understood that once the [Petitioner] got Mr. Gaspar out of the vehicle, Mr. Gaspar hung onto the vehicle for a short time before the [Petitioner] drove away.

Officer Beth Goodman was an evidence technician for the Knoxville Police Department at the time of the shooting and responded to the scene. Upon entering the home, she observed an empty box for a Glock pistol on a coffee table in the living room. She also observed evidence of a shooting in the hallway between the living room and the kitchen. Articles of Mr. Daniels's clothing, which emergency personnel had cut off of him when rendering aid, and one of Mr. Daniels's shoes were on the floor in the hallway. Officer Goodman noted multiple blood stains and smears in the hallway, and she recovered a lock-blade knife near Mr. Daniels's shoe. Officer Goodman recovered six .45-caliber casings, three .380-caliber casings, and two bullets or fragments in the home. One bullet was recovered in the wall of the hallway near a baseboard, and another bullet was recovered in the living room. She noted multiple defects from bullets in the floor and baseboard in the hallway. One bullet traveled through the wall of the hallway, into a bedroom, and out of a window.

Officer Goodman went to the alley behind the home where she observed multiple blood stains, as well as clothing that was identified at trial as belonging to Mr. Gaspar. She recovered a pistol, two .380-caliber casings, and a plastic container with 27.26 grams of a green, leafy substance believed to be marijuana.

On cross-examination, Officer Goodman testified that four of the .45-caliber casings found in the home were Federal brand casings and that the other two .45-caliber casings were Remington Peters brand casings. The knife was open when Officer Goodman recovered it.

Officer Russell Whitfield, a member of the forensic unit of the Knoxville Police Department, went to the location where Mr. Gaspar's SUV was located. Officer Whitfield observed blood on the driver's side door, the floorboard, and a tire and its chrome. A child's car seat and bicycles were inside the vehicle. Officer Whitfield took photographs of the interior of the vehicle, which showed the bicycles on top of several items behind the passenger's seat and blocking the driver's view of the rear window.
Officer Whitfield later returned to the scene when officers recovered a Glock Model 36 .45-caliber handgun amongst thick brush at the bottom of a steep, wooded hill. He testified that the gun's slide was at the rear and that the chamber and the

Case 3:23-cv-00356-JRG-DCP   Document 22   Filed 10/11/24   Page 7 of 37   PageID #: 2013

magazine were empty. On cross-examination, he testified that the gun was found "locked open," which indicated that someone had fired the gun until it was empty. Mr. Keith Proctor with the DNA and serology section of the Tennessee Bureau of Investigation's crime laboratory in Knoxville was accepted by the trial court as an expert in DNA analysis. He testified that a swab from the driver's side door of the vehicle tested positive for blood and that the DNA profile obtained from the swab belonged to Mr. Gaspar. Mr. Proctor obtained a partial DNA profile of a mixture from at least two individuals from a swab of blood from the steering wheel. Mr. Gaspar was the major contributor at seven locations, and the remaining locations, as well as the minor contributor, were inconclusive due to insufficient or degraded DNA. Presumptive testing of a second swab of the steering wheel did not indicate the presence of blood. Mr. Proctor obtained a partial DNA profile from the swab that was consistent with a mixture of at least two individuals. The major contributors were consistent with a mixture of the DNA of the [Petitioner] and Mr. Gaspar at five locations. The remaining locations were inconclusive due to insufficient or degraded DNA.

Ms. Patricia Resig, a firearms examiner with the Knoxville Police Department, was accepted by the trial court as an expert in firearms analysis. She testified that she examined a .380-caliber FEG semi-automatic pistol, a .45-auto caliber Model 36 Glock semi-automatic pistol, and the casings and bullets recovered at the scene. She determined that a .380-caliber bullet and three of the five .380-caliber casings were fired from the .380-caliber pistol. Ms. Resig stated that the other two .380-caliber casings displayed the same class characteristics and some of the same individual characters as the other fired casings but that she was unable to conclude with "100 percent certainty" that they were fired from the .380-caliber pistol. She said the two .380-caliber casings could have been fired from the .380-caliber pistol. She noted that of the six .45-caliber casings that she examined, two casings were Remington Peters brand casings and that two were Federal brand casings. She concluded that all six .45-caliber casings recovered were fired from the .45-caliber pistol. She stated that while a fired .45-caliber bullet was recovered, the bullet lacked sufficient matching individual characteristics to allow her to conclude that the bullet was fired from the .45-caliber pistol.

The [Petitioner] testified in his own defense that he met Mr. Marsh and Mr. Daniels through Ms. Brittany Goosie, from whom the [Petitioner] previously had purchased marijuana. The [Petitioner] asked Ms. Goosie about purchasing "Molly," and Ms. Goosie introduced him to her boyfriend, Mr. Daniels. The [Petitioner] said that he purchased "Molly" from Mr. Daniels and that he purchased drugs from Mr. Marsh on two prior occasions.

The [Petitioner] testified that on the day of the shooting, he called Mr. Marsh about purchasing drugs. Mr. Marsh told him that he was in Gatlinburg and that it would take some time to return home. After a few hours, the [Petitioner] called Mr. Marsh for directions, and Mr. Marsh gave his cell phone to Mr. Daniels, who provided the [Petitioner] with directions to the home. The [Petitioner] stated that he walked to

8

the home, entered through the back door, and sat on the couch in the living room. Mr. Marsh was not there when the [Petitioner] arrived, and Mr. Marsh subsequently arrived with Mr. Coleman and a large amount of marijuana. The [Petitioner] did not know Mr. Carson and believed Mr. Marsh had the marijuana.

The [Petitioner] testified that he took a photograph of the marijuana and walked outside to call his brother about the marijuana. The [Petitioner] stated that Mr. Marsh previously had "ripped him off," and the [Petitioner] told his brother than he planned to get the money that Mr. Marsh owed him. When the [Petitioner] reentered the home, Mr. Marsh was in the kitchen with a gun in his holster. The [Petitioner] said that Mr. Marsh did not have the gun when he first entered the home and that Mr. Marsh must have "grabbed it when everything was going down." The [Petitioner] stated that Mr. Marsh said he would not return the money and that Mr. Marsh put his hand on his gun. The [Petitioner] also stated that Mr. Marsh touched his hip but did not pull out his gun. The [Petitioner] said that he pulled out his gun because he was angry and that Mr. Marsh then pulled out his gun. The [Petitioner] believed he fired his gun at Mr. Marsh, but he was not certain.

The [Petitioner] testified that Mr. Marsh dropped his gun, and the [Petitioner] grabbed it. The [Petitioner] explained that it happened "really fast" and that he picked up Mr. Marsh's gun because he was scared and did not want Mr. Marsh to retrieve the gun. The [Petitioner] maintained that he believed Mr. Marsh would shoot him if Mr. Marsh were able to retrieve his gun. The [Petitioner] denied holding the gun to Mr. Marsh's head. Once the [Petitioner] grabbed Mr. Marsh's gun, he turned around and saw Mr. Daniels running at him with a knife. The [Petitioner] stated that he was afraid and believed he shot Mr. Daniels four or five times, but the [Petitioner] also maintained that he was unsure the exact number of times that he initially shot Mr. Daniels. The [Petitioner] said Mr. Daniels continued to run toward him, so he shot Mr. Daniels "a couple more times," after which Mr. Daniels fell. The [Petitioner] stated that he was "freaking out," saw Mr. Daniels reaching for something, and shot him once more. The [Petitioner] ran into the living room, grabbed the marijuana, and ran out of the back door. He stated that approximately three minutes had passed between Mr. Marsh's arrival and the shooting and that the shooting continued for less than two minutes.

The [Petitioner] testified that after running out of the home, he approached Mr. Gaspar and "upped the gun on him." The [Petitioner] explained that he was trying to take Mr. Gaspar's vehicle because he was afraid and was "really freaking out." The [Petitioner] maintained that he did not know that children were in the vehicle because the windows were tinted. When the [Petitioner] confronted Mr. Gaspar, Mr. Gaspar tried to grab the [Petitioner]'s arm; the [Petitioner] shot him; Mr. Gaspar did not let go; and the [Petitioner] shot him again. The [Petitioner] dropped the gun; Mr. Gaspar got out of the vehicle; and the [Petitioner] drove away. The [Petitioner] stated that the encounter with Mr. Gaspar lasted forty-five seconds to one minute. While fleeing, the [Petitioner] crashed the vehicle and abandoned the vehicle on a dead end street.

On cross-examination, the [Petitioner] testified that he had purchased marijuana from Ms. Goosie on three or four occasions, that Ms. Goosie has "shorted" him marijuana on one occasion, and that Mr. Marsh and Ms. Goosie were working together. The [Petitioner] said Mr. Marsh contacted him on Facebook, stated that Ms. Goosie was in jail, and asked the [Petitioner] to help "move" marijuana for him. The [Petitioner] said he planned to ask Mr. Marsh for the "shorted" marijuana because the [Petitioner] believed the purpose of the drug transaction was to help Ms. Goosie.

The [Petitioner] agreed that he did not intend to purchase marijuana and that his plan was to rob the victims of marijuana. He agreed that he called Mr. Marsh under the guise of purchasing marijuana and that he told Mr. Marsh that he would purchase two pounds for $6,800. The [Petitioner] brought money and a gun for "protection." He did not have a handgun permit and maintained that he obtained the gun from a friend and did not know it was loaded. He also maintained that he was not planning to shoot anyone and that he did not know that guns were in the home until he saw Mr. Marsh with one. The [Petitioner] testified that Mr. Marsh did not reach for his gun but grabbed his hip, which the [Petitioner] understood to be a threat. The [Petitioner] then pulled out his gun. He did not know where he shot Mr. Daniels and denied returning from the living room to shoot him again. The [Petitioner] said that during the shooting, one of the men who fled took two pounds of marijuana with him. The [Petitioner] took the marijuana that remained in the living room.

The [Petitioner] testified that he was holding one gun in one hand and the marijuana in his other hand when he confronted Mr. Gaspar. The other gun was in the [Petitioner]'s pocket. The [Petitioner] stated that while struggling with Mr. Gaspar over the gun, the gun fired twice, that Mr. Gaspar opened the door and got out, and that the [Petitioner] then entered the vehicle. The [Petitioner] maintained that he did not look inside the vehicle and did not know that what items were inside. He acknowledged that he threw a gun into the woods.

On redirect examination, the [Petitioner] testified that he always had a gun whenever he was involved in a drug transaction. He stated that he had cash with him at the time of the shooting and that he likely would have purchased more drugs had the victims given him the drugs that he had been "shorted." The [Petitioner] maintained that he picked up Mr. Marsh's gun before Mr. Marsh could do so. The [Petitioner] also maintained that he did not intend to kill Mr. Daniels and that every time he shot Mr. Daniels, he believed Mr. Daniels was coming at him or was otherwise a threat.

The [Petitioner] testified that he did not purposely try to shoot Mr. Gaspar. The [Petitioner] stated that as he was trying to get into the vehicle, Mr. Gaspar reached for the gun, that the gun was fired during the struggle, that Mr. Gaspar would not let go of the gun, and that the [Petitioner] shot him again. The [Petitioner]

maintained that he did not know the bicycles were in the vehicle when he drove away.

The [Petitioner] was charged with two counts of especially aggravated kidnapping of Mr. Marsh, two counts of aggravated robbery of Mr. Marsh, two counts of attempted first degree murder of Mr. Daniels, two counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, two counts of employing a firearm during the commission of a dangerous felony, to-wit: carjacking, and two counts of especially aggravated robbery of Mr. Gaspar. The jury acquitted the [Petitioner] of two counts of especially aggravated kidnapping and convicted him of the remaining charges.

*State v. Fleming*[2], No. E2019-00078-CCA-R3-CD, 2020 WL 1875240, at *7 (Tenn. Crim. App. Apr. 15, 2020), *perm. app. denied* (Tenn. July 17, 2020) ("*Flemming I*"). A jury convicted Petitioner of two counts of aggravated robbery, two counts of attempted first-degree murder, four counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, and two counts of especially aggravated kidnapping [Doc. 13-1 at 118–19].

The trial court subsequently held a sentencing hearing. The TCCA summarized the evidence introduced at that hearing and described the trial court's imposition of Petitioner's sentence as follows:

During the sentencing hearing, the State entered the [Petitioner]'s presentence report into evidence. The presentence report reflected that the twenty-three-year-old [Petitioner] had prior convictions for traffic-related offenses and possession of drug paraphernalia, as well as multiple juvenile offenses. He also had pending charges for assault and drug offenses. He admitted to using marijuana, Xanax, and hydrocodone on a daily basis, "MDMA" multiple times a week, and mushrooms once every two months. He had no history of employment. The presentence report stated that according to a mental health assessment report dated after the offenses and prior to trial, the [Petitioner] was diagnosed with antisocial personality disorder, severe cannabis use disorder, severe opioid use disorder, severe sedative, hypnotic, and anxiolytic use disorder, and moderate alcohol use disorder.

Mr. Daniels's sister read Mr. Daniels's impact statement to the trial court. In the statement, Mr. Daniels recalled the feeling of "terror and helplessness" when the [Petitioner] attacked him. Mr. Daniels described his injuries, the pain as a result of the injuries, his months in the hospital, and his numerous surgeries. He stated that

---

[2] This is the spelling of Petitioner's last name in his Petitioner's direct appeal to the TCCA, and it is the spelling the TCCA retained for its direct-appeal opinion. However, the Court will refer to this decision as "*Flemming I*" because the remainder of Petitioner's filings indicate that "Flemming" is the proper spelling of his name.

he continued to suffer night terrors, was unable to work due to his injuries, and had to depend on his family for financial support. Mr. Daniels's sister also provided a victim impact statement in which she detailed the stress and pressure that has affected her family since the shooting. Mr. Gaspar gave an impact statement through an interpreter in which he said he was unable to work on a daily basis since the shooting and that his family has suffered financially as a result.

The trial court took that matter under advisement and subsequently entered an order and a corrected order in which it applied four enhancement factors and found that no mitigating factors applied. In imposing consecutive sentences, the trial court found that the [Petitioner] is a "professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). The trial court stated that the [Petitioner] was twenty-three or twenty-four years old, did not have an employment history, and had testified that he used and sold drugs. The trial court found that this evidence established that "to the extent the [Petitioner] has made a living, he has done so by committing crimes."

The trial court also found that the [Petitioner] was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The trial court stated that the circumstances surrounding the commission of the offenses were aggravated. The trial court noted that the [Petitioner] had a loaded handgun and approached Mr. Gaspar, who was in his vehicle with his two young children and his brother; that the [Petitioner] reached into the vehicle and struggled with Mr. Gaspar while trying to pull him out of the car; and that the gun could have easily discharged during the struggle, wounding or killing Mr. Gaspar's children, his brother, a neighbor, or a passerby. The trial court stated that these circumstances, along with the magnitude and severity of the injuries to Mr. Daniels and Mr. Gaspar, supported a finding that the circumstances were aggravated. The trial court found that confinement for an extended period of time was necessary to protect society from "the [Petitioner]'s unwillingness to lead a productive life and the [Petitioner]'s resort to criminal activity in furtherance of an antisocial lifestyle." The trial court noted that according to the presentence report, the [Petitioner] had been diagnosed with antisocial personality disorder, severe cannabis use disorder, severe opioid use disorder, and substance abuse psychotic disorder. The trial court found that these factors, along with the [Petitioner]'s "only means of making a living," justify "a very long period of protection for the community." Finally, the trial court found that the aggregate length of the sentences reasonably related to the facts and circumstances of the offenses for which the [Petitioner] was convicted. The trial court stated that the [Petitioner]'s convictions for attempted first degree murder and especially aggravated robbery were among the most serious crimes in Tennessee and that the [Petitioner]'s action resulted in two victims suffering serious and permanent injuries.

While the trial court imposed individual sentences for each conviction, the trial court also merged the two aggravated robbery convictions, the two convictions for

attempted first degree murder, the two convictions for employing a firearm during the commission of a dangerous felony, the two convictions for employing a firearm during the commission of a dangerous felony to wit: carjacking, the two carjacking convictions, and the two especially aggravated robbery convictions.

*Id.* at * 8–9.  The trial court ultimately imposed an effective sixty-eight-year sentence.  *Id.* at *9.

On appeal, the TCCA affirmed the trial court [Doc. 13-18].  The Tennessee Supreme Court denied Petitioner's application for discretionary review [Doc. 13-21].

Petitioner then filed a petition for post-conviction relief in the trial court [Doc. 13-22 at 4–23].  The trial court appointed post-conviction counsel, who filed an amended petition [*Id.* at 29–31].  Thereafter, an evidentiary hearing was held, and the following is the TCCA's summary of the evidence adduced at that hearing:

The Petitioner testified at his post-conviction hearing that his sentencing hearing was "around" August 21, 2016. He stated that he was not present when a written sentencing order and judgment were filed around September 2017. The Petitioner asserted that trial counsel did not object to the Petitioner's absence when the sentencing order was entered. He also asserted that counsel did not object to the delay in sentencing. The Petitioner stated that he learned of his sentence from Tennessee Department of Correction records.

The Petitioner testified that during the intervening period between the sentencing hearing and before the issuance of the sentencing order and judgments, trial counsel filed a motion to withdraw due to the deterioration of the relationship with the Petitioner. The trial court granted the motion to withdraw and appointed appellate counsel for the motion for a new trial.

The Petitioner testified that appellate counsel sent the Petitioner a copy of the appellate brief but did not communicate otherwise. The Petitioner asserted that appellate counsel did not raise the issues of jury tampering, sentencing delay, and the Petitioner's absence for the entry of the sentencing order. The Petitioner said that he would have received a lesser sentence if he had received the effective assistance of trial counsel. To support his claim, the Petitioner stated that in his appeal from the conviction proceedings, the appellate court said that appellate counsel should have pursued a sufficiency of the evidence claim.

On cross-examination, the Petitioner testified that trial counsel could have more effectively convinced the jury that the Petitioner should have been convicted of attempted voluntary manslaughter as a lesser included offense of attempted first degree murder. The Petitioner acknowledged that counsel did his best to defend the

13

especially aggravated robbery charge. The Petitioner said that he wanted to be present for the entry of the sentencing order for the trial court to see his remorse. The Petitioner admitted that he was allowed to address the court at the sentencing hearing and that he declined to address the court. The Petitioner conceded that he was given an opportunity to state his "feelings" when he was interviewed for the presentence report.

The Petitioner testified that when he learned of the appointment of appellate counsel, he informed counsel of claims related to jury tampering, insufficient evidence, and sentencing. The Petitioner remembered that his first conversation with counsel occurred after the motion for a new trial hearing and that the conversation was short and about strategy.

The Petitioner testified that appellate counsel had given the Petitioner a copy of the appellate brief. The Petitioner stated that after this court affirmed the convictions, counsel informed the Petitioner that the Tennessee Supreme Court denied the application for permission to appeal. The Petitioner said that the final communication he received from counsel stated the Petitioner would be appointed new counsel for post-conviction proceedings.

The Petitioner maintained that had appellate and trial counsel represented him differently, he would have been convicted of attempted voluntary manslaughter, rather than attempted first degree murder, and he would not have been convicted of especially aggravated robbery.

Trial counsel testified that he focused his trial strategy on challenging the sufficiency of the evidence for the carjacking and the attempted first degree murder charges. Counsel stated that he discussed with the Petitioner the strategy of arguing that the Petitioner was overcharged.

On cross-examination, trial counsel testified that he asked to withdraw from representation before the motion for a new trial was filed due to an irreparable breakdown in the attorney-client relationship. Counsel could not recall if he had conversations with the Petitioner about the delay between the sentencing hearing and the filing of the sentencing order and judgments. Counsel testified that he asked the trial court about the status of the Petitioner's judgments and sentencing order and encouraged the court to issue the order. Counsel also could not recall if after the sentencing hearing he informed the Petitioner that the judgments would not take long to be filed.

Trial counsel could not recall any incident in which someone reportedly video recorded the jury. Counsel maintained that if he had witnessed the video recording of a juror, he would have brought it to the trial court's attention. Even though he could not recall the details of the alleged recording event, counsel acknowledged that the trial transcript correctly reflected any actions he took.

Appellate counsel testified that he was appointed to the Petitioner's case after trial counsel was allowed to withdraw. When appellate counsel reviewed the transcript, he determined that the Petitioner's mens rea was a disputed legal issue. Counsel focused his appellate strategy on the sufficiency of the evidence to support the attempted first degree murder and especially aggravated robbery convictions. Counsel also identified excessive sentencing as a viable issue on appeal.

Appellate counsel testified that he wrote the Petitioner at least five times and that he communicated with the Petitioner's family throughout the appeal process. Counsel said he explained to the Petitioner that a delay in sentencing was not unusual for the trial court. Counsel said that when the Petitioner mentioned raising on appeal the video recording incident, counsel advised the Petitioner that no legal issue was apparent from the trial transcript. Counsel testified that in his opinion, trial counsel had not performed deficiently in not asking for a mistrial after the recording incident. Appellant counsel said the trial transcript contained no evidence to support a mistrial or a claim of jury tampering.

Appellate counsel testified that he raised the same issues in the motion for a new trial and on appeal. Counsel said that when this court affirmed the convictions, he filed a Tennessee Supreme Court Rule 11 application, which was denied.

On cross-examination, appellate counsel testified that he learned of the Petitioner's sentences before the motion for a new trial was filed. Counsel said he obtained the sentencing order during the summer of 2017 before obtaining the trial transcript. Counsel said that he informed the Petitioner a delayed sentencing order was not a speedy trial issue, that a delay in issuing a written sentencing order was not uncommon for the trial court, and that he believed the delay did not impact the sentence.

Appellate counsel testified that he received many letters from the Petitioner regarding issues for appeal and that he responded to them. Counsel said he received the trial transcripts and researched the issues he intended to raise on appeal. He filed an amended motion for a new trial in November 2018. Counsel telephoned trial counsel, discussed the trial, and decided to raise sufficiency of the evidence on appeal.

The post-conviction court denied relief and held that the Petitioner had waived his right to raise as a due process violation due to the delay between the sentencing hearing and the entry of the sentencing order, as the Petitioner failed to raise the issue in his motion for a new trial or on direct appeal. The court found that while the delay in sentencing was somewhat "extensive," the delay was not greater than the minimum service requirement for the effective sentence imposed. The court found that trial counsel could not be expected to urge a trial court to issue a sentencing order before the court was ready. The post-conviction court concluded that neither trial nor appellate counsel acted deficiently in not raising a delay-in-sentencing claim.

15

The post-conviction court found that the Petitioner failed to demonstrate that he was prejudiced by the delay in sentencing. The court noted that the Petitioner did not testify or allocute at the sentencing hearing. The court noted that the Petitioner's only statement of remorse was in the presentence report. The court acknowledged that the delay in sentencing was longer than in most cases but that the Petitioner failed to demonstrate that he was prejudiced by the delay.

The post-conviction court found that the Petitioner was present and represented by counsel throughout the sentencing and that the sentence was not imposed during the hearing but issued later by the entry of a written order. The court found that it was unnecessary for the Petitioner to be present, as there was no proceeding to be present for at the entry of the sentencing order; that the Petitioner failed to demonstrate that his absence for the entry of the sentencing order prejudiced him; and that trial counsel was not deficient for not requesting the Petitioner's presence at the entry of the sentencing order.

*Flemming v. State*, E2021-00928-CCA-R3-PC, 2022 WL 17590861, at *1 (Tenn. Crim. App. Dec. 13, 2022), *perm. appeal denied* (Tenn. Mar. 8, 2023) ("*Flemming II*"). Petitioner appealed the denial of post-conviction relief to the TCCA [Doc. 13-24]. The TCCA affirmed the post-conviction court's denial of relief [Doc. 13-27], and the Tennessee Supreme Court denied discretionary review [Doc. 13-30].

Thereafter, Petitioner filed a timely federal habeas petition raising the following grounds for relief, as paraphrased by the Court: (1) the post-conviction court applied an incorrect standard of review; (2) the evidence was insufficient to support Petitioner's convictions for attempted first-degree murder and especially aggravated robbery; (3) trial counsel rendered ineffective assistance; and (4) there was an outside influence on Petitioner's jury that was not explored through a hearing [*See* Docs. 1, 2]. This Court ordered Respondent to file a response to the petition and the State-court record [Doc. 11]. Respondent subsequently filed the State-court record[3] [Doc. 13] and his

---

[3] The Court granted Respondent's request to waive the filing of a physical trial exhibit—a 911 call introduced at Petitioner's trial [Doc. 14]—finding the exhibit immaterial to the resolution of the petition [Doc. 18 at 1].

response to the petition [Doc. 15], to which Petitioner replied [Doc. 21]. This matter is now ripe for review.

## II.     LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable−a substantially higher threshold."); *Williams*, 529 U.S. at 410–11. Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state

court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729, 731–32, 735 n.1 (1991).

Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 302–03 (1984)). In Tennessee, presentation of the claim to the TCCA satisfies this requirement. Tenn. S. Ct. R. 39. But if a prisoner never presented a claim to the TCCA and a state procedural rule now bars presentation of the claim, because, for example, it is barred by Tennessee's one-year statute of limitation on post-conviction actions or its prohibition against second petitions, that claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Coleman*, 501 U.S. at 731–32, 750; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally

18

defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

In some circumstances, a procedural default may be circumvented to allow federal habeas review of a claim. But that is appropriate only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). The exception for a fundamental miscarriage of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is "actually innocent of the underlying offense[.]" *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, a viable claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

With regard to the "cause and prejudice" exception for procedural default, the "prejudice" sufficient to overcome a default must be actual, with the petitioner bearing "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). And "cause" for a default is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules. *See Coleman*, 501 U.S. at 753.

Generally, errors of post-conviction counsel cannot serve as "cause" to excuse a procedural default. *Id.* at 752. An exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may, under certain circumstances, establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a [Petitioner]'s procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13–14, 16–17). This exception, commonly referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

Therefore, when considering an ineffective assistance of trial counsel claim under *Martinez*, a petitioner must show the ineffectiveness of post-conviction counsel and "the 'substantial' nature of his underlying [ineffective assistance of trial counsel] claims." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). A substantial claim is one that "has some merit." *Martinez*, 566 U.S. at 14. Conversely, a claim is insubstantial if it "does not have any merit or . . . is wholly without factual support." *Id.* at 15–16. And if the petitioner can successfully demonstrate cause and prejudice of post-conviction counsel under this preliminary review, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

However, the *Martinez* exception does not apply to a claim of ineffective assistance of trial counsel that a petitioner raised in the initial-review collateral stages and defaulted on appeal. *See, e.g., Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals"). And *Martinez* does not excuse a petitioner's failure to develop a factual record for a claim, even where he attributes that failure to the ineffective assistance of his post-conviction counsel. *Shinn v. Ramirez*, 596 U.S. 366, 383 (2022).

Rather, when a federal habeas claim is not adequately developed in state court, a federal habeas court may not consider any evidence beyond the state-court record to address the merits of the claim unless the petitioner satisfies the requirements in 28 U.S.C. § 2254(e)(2). *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022); *see also Henderson v. Mays*, No. 12-5028/14-5911, 2023 WL 3347496, at *18 (6th Cir. May 10, 2023) (concluding that *Shinn* foreclosed consideration of evidence outside of state-court record that did not meet § 2254(e)(2)'s requirements "regardless whether the issue was adjudicated on the merits or procedurally defaulted"). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

21

28 U.S.C. § 2254(e)(2). Thus, federal courts may allow factual development of a claim "only if [the petitioner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004).

With these standards in mind, the Court turns to a consideration of Petitioner's claims.

## III. ANALYSIS

### A. Ground One

In his first ground for relief, Petitioner alleges that the post-conviction trial court applied the wrong legal standard to his ineffective assistance of counsel claims, which impermissibly increased his burden of proof during post-conviction proceedings [Doc. 1 at 9–10; Doc. 2 at 1–3].

Under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner establishes that he received the constitutionally ineffective assistance of counsel by demonstrating constitutionally deficient performance by counsel that actually prejudiced the defense. *Id*. at 687. Prejudice is established where the petitioner can demonstrate a "reasonable probability" that the result of the proceedings would have been different but for the alleged error(s) of counsel, thereby undermining confidence in the reliability of the outcome. *Id*. at 687, 694. In this case, Petitioner maintains that the post-conviction trial court improperly used a "clear and convincing" standard of proof, rather the "reasonable probability" standard set forth in *Strickland* [Doc. 1 at 9–10; Doc. 2 at 1–3].

In its order denying post-conviction relief, the post-conviction trial court made statements that Petitioner failed to prove counsel's deficiency or resulting prejudice by clear and convincing evidence [Doc. 13-22 at 54, 55, 57, 61, 62]. On post-conviction appeal, the TCCA affirmed the post-conviction trial court's decision while noting its language was "imprecise." *Flemming II*,

2022 WL 17590861, at *5.  The TCCA found that "when read in the overall context of the order, it [wa]s apparent that the court considered whether the Petitioner had established by clear and convincing evidence the facts to support each of his claims[,]" which is the correct State-law standard for a petitioner to prove his factual allegations to the post-conviction trial court.  *Id.*; *see also* Tenn. Code Ann. § 40-30-110(f).  The TCCA found that the post-conviction trial court "examined whether the Petitioner had established *facts* to support both the deficiency and prejudice prongs of the ineffective assistance of counsel claims" and held that it "applied the appropriate legal standard in deciding the issues[.]"  *Id.* (emphasis added).

The post-conviction trial court's order correctly stated that Petitioner bore the burden of proving his factual allegations by clear and convincing evidence; it correctly identified the law applicable to both the deficiency and prejudice prongs of the *Strickland* test; and it properly analyzed each of Petitioner's ineffective-assistance claims under both prongs of the *Strickland* test [*Id.* at 50–63].  As the TCCA noted, the post-conviction trial court's use of the "clear and convincing evidence" standard denotes its decision that Petitioner failed to establish the facts to sustain his legal claims of ineffective assistance.  And Petitioner's argument to the contrary ignores the requirement that "state-court decisions be given the benefit of the doubt" and "is inconsistent with the presumption that state courts know and follow the law."  *Johnson v. Genovese*, 924 F.3d 929, 935–36 (6th Cir. 2019) (quoting *Holland v. Jackson*, 542 U.S. 649, 655 (2004)).  Like the situation presented in *Johnson*, the post-conviction trial court's use of the "clear and convincing" standard in this case was reference to "the general burden of proof in post-conviction proceedings with regard to factual contentions."  *Id.* at 936.  Therefore, the Court finds the TCCA's decision rejecting this claim fails to warrant relief under the AEDPA.

**B.      Ground Two**

Next, Petitioner argues that the prosecution introduced insufficient evidence to convict him of the attempted first-degree murder of Mr. Daniels and the especially aggravated robbery of Mr. Gaspar [Doc. 1 at 13; Doc. 2 at 4–7]. These claims were rejected on their merits by the TCCA. *Flemming I*, 2020 WL 1875240, at *11–12.

The clearly established federal law governing sufficiency-of-the-evidence claims is set forth in *Jackson v. Virginia*, which holds that evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard acknowledges the factfinder's role to resolve all conflicts in testimony, weigh the evidence, and "draw reasonable inferences from basic facts to ultimate facts." *Id*. And a habeas court reviewing a properly exhausted *Jackson* claim affords it a doubly deferential standard of review. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, a court reviewing the verdict can set it aside "only if no rational trier of fact could have agreed with the jury." *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). Second, a federal habeas court must account for the statutory deference under § 2254(d) allotted to the state court's review of the jury's findings. *Id*. Thus, a habeas court reviewing the state court may overturn the state court's decision "only if the state court decision was objectively unreasonable." *Id*. (internal quotation marks omitted).

In evaluating the sufficiency of the evidence against Petitioner, this Court must examine the "substantive elements of the criminal offense" under Tennessee law. *Jackson*, 443 U.S. at 324 n.16.

### 1. Attempted First-Degree Murder

Petitioner argues that the evidence was insufficient to support his conviction for the "attempted premeditated murder" of Mr. Daniels [Doc. 2 at 4]. As relevant here, first-degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A "criminal attempt" to commit an offense occurs where:

> (a) A person . . . acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)–(3). In Petitioner's case, the TCCA defined "premeditated" as acting with the "exercise of reflection and judgment[,]" *see* Tenn Code Ann. § 39-13-202(e), and it noted that premeditation requires a finding that "the intent to kill must have been formed prior to the act itself." *Flemming I*, 2020 1875240, at *10. It explained that the statute requires "that the mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether [he] was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* (internal quotation marks and alterations omitted). Thus, "[p]remeditation is a question of fact for the jury's determination" and can be shown "by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute." *Id.*

Petitioner fails to demonstrate that the TCCA's decision contradicted or unreasonably applied *Jackson*. Rather, Petitioner argues only that his testimony shows that the crime was not premeditated [Doc. 1 at 13; Doc. 2 at 39–40]. But this argument—reweighing the evidence after the jury "resolve[d] conflicts in the testimony"—is one that *Jackson* forecloses. *Jackson*, 443 U.S. at 319.

Regardless, a rational juror could have found Petitioner attempted to kill Daniels with premeditation based on the evidence presented at Petitioner's trial. The jury was presented with evidence that Petitioner planned to rob Mr. Marsh and Mr. Daniels, and that, to accomplish this, he "walked outside and returned with a gun." *Flemming I*, 2020 WL 1875240, at *11. He shot Mr. Daniels multiple times after he dropped his knife and surrendered to Petitioner. *Id.* Petitioner then stood over Mr. Daniels and shot the already-wounded Daniels with Mr. Marsh's gun "until it ran out of bullets." *Id.* And Mr. Daniels was seriously injured as a result. *Id.* Therefore, evidence presented at trial was sufficient for a rational factfinder to convict Petitioner of the attempted first-degree murder of Mr. Daniels beyond a reasonable doubt, and the TCCA's rejection of this claim was not contrary to, or based on an unreasonable application of, *Jackson*. And the TCCA's rejection of this claim was not based upon an unreasonable determination of facts in light of the evidence presented in the State-court proceedings. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### 2.    Especially Aggravated Robbery

Petitioner also claims that the evidence is insufficient to support his conviction for the especially aggravated robbery "of the bicycles from Mateo Gese Gaspar that occurred during the car[]jacking" [Doc. 2 at 6]. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

And "[e]specially aggravated robbery" is robbery "[a]ccomplished with a deadly weapon[] [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). "Theft of property" is when a person "with the intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). And a deprivation of property occurs where the defendant "[w]ithhold[s] property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner"; "[w]ithhold[s] property or cause[s] it to be withheld for the purpose of restoring it only upon payment of a reward or other compensation"; or "[d]ispose[s] of property or use[s] it or transfer[s] any interest in it under circumstances that make its restoration unlikely." Tenn. Code Ann. § 39-11-106(9). The intent to deprive may be based "solely upon circumstantial evidence" that can be inferred from the other facts in the case. *Flemming I*, 2020 WL 1875240, at *12.

Citing *Jackson*, the TCCA affirmed the jury's decision that Petitioner "took the vehicle with the intent to deprive Mr. Gaspar of" the bicycles inside. *Id.* It noted that Petitioner, while armed, approached Mr. Gaspar and demanded the vehicle, and that the bicycles were in clear view of the driver. *Id.* It determined "that the jury could infer based upon the size and location of the bicycles that the [Petitioner] knew the bicycles were in the vehicle when he drove away[.]" *Id.* The TCCA further noted that evidence was presented that Petitioner shot Mr. Gaspar twice, drove away with the bicycles inside, crashed the vehicle, and then abandoned it. *Id.* It concluded "this evidence is sufficient to establish that the Defendant obtained the bicycles with the intent to deprive Mr. Gaspar of them." *Id.*

Under *Jackson*, the jury may "draw reasonable inferences from basic facts to ultimate facts" when reaching its conclusions about the evidence. *Jackson*, 443 U.S. at 319. The TCCA

applied this rule when it concluded that the jury could reasonably infer from the "size and location of the bicycles" that Petitioner "knew the bicycles were in the vehicle when he drove away[.]" *Flemming I*, 2020 WL 1875240, at *12. And because the evidence presented at trial was sufficient for a rational factfinder to convict Petitioner of especially aggravated robbery of Mr. Gaspar beyond a reasonable doubt, the TCCA's rejection of this claim was not contrary to, or based on an unreasonable application of, *Jackson*, nor was it based on an unreasonable determination of facts in light of the evidence presented in the State-court proceedings. Petitioner is not entitled to federal habeas relief on this claim.

### C.     Ground Three

Petitioner alleges that he received the ineffective assistance of both trial and appellate counsel based on their perceived deficiency in not challenging (1) the sufficiency of the evidence for Petitioner's attempted-murder and especially-aggravated-robbery convictions; (2) that Petitioner was not present when the trial court entered its sentencing order; and (3) the delay between the sentencing hearing and the imposition of the sentence on due-process grounds [Doc. 1 at 11–15; Doc. 2 at 4–10].

The standard set forth in *Strickland v. Washington* governs these claims. Under *Strickland*, a petitioner must satisfy a conjunctive, two-pronged test to establish the constitutionally ineffective assistance of counsel: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. 466 U.S. at 687. Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687–88. But a reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort

to "eliminate the distorting effects of hindsight." *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome.[4] *Id*. at 687, 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id*. at 691.

### 1. Sufficiency of the Evidence

Petitioner argues that trial counsel "was ineffective in failing to show" that the prosecution did not establish the premeditation element for his attempted-first-degree-murder conviction beyond a reasonable doubt, and that appellate counsel performed ineffectively in failing to challenge this matter before the TCCA [Doc. 1 at 13; Doc. 2 at 4–6]. He also maintains that counsel "failed to hold the state to its burden" to prove Petitioner's intent as to the robbery of the bicycles from Mr. Gaspar's vehicle [Doc. 1 at 13; Doc. 2 at 6–7].

However, Petitioner did not exhaust these ineffective-assistance claims during his post-conviction appeal, as he did not present them to at least the TCCA [*See* Doc. 13-24]. *See Adams*, 330 F.3d 398; *see also* Tenn. S. Ct. R. 39. Because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust these claims, they are technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657; *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

---

[4] The two-prong standard is the same for claims of ineffective assistance of appellate counsel. A petitioner shows that appellate counsel's deficiency prejudiced his defense by showing a "reasonable probability" that he "would have prevailed on appeal" had counsel performed reasonably. *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009) (quoting *Mapes v. Tate*, 388 F.3d187, 194 (6th Cir. 2004)).

29

Therefore, the Court may review the merits of Petitioner's claims only if he establishes cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would result if the Court did not consider it. Petitioner does not argue, much less establish, these exceptions. The fundamental-miscarriage-of-justice exception is inapplicable, as Petitioner does not deny his involvement in the incidents forming the basis of his convictions. And Petitioner may not rely upon the *Martinez* exception to establish cause for the default, as these claims were raised before the post-conviction trial court but were not presented to the TCCA on post-conviction appeal [*Compare* Doc. 13-22 at 10–15, 30 *with* Doc. 13-24]. *See West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015) (explaining that *Martinez* exception "does not extend to attorney error at post-conviction appellate proceedings because those proceedings are not the first occasion at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claim") (citation omitted).

Further, Petitioner has not shown that trial counsel performed deficiently, or that counsel's performance resulted in actual prejudice. Petitioner complains that trial counsel should have argued that Petitioner was "over charged[,]" and that he failed to challenge the alleged lack of proof regarding premeditation (as to the charge of attempted murder) and intent (as to the charge of especially aggravated robbery) [*See* Doc. 2 at 40]. But Petitioner's defense was centered around arguments that Petitioner should be acquitted or convicted of lesser-included offenses as to the especially-aggravated-robbery and attempted-first-degree-murder counts [*See* Doc. 13-23 at 42–68; *see also generally* Doc. 13-10—Doc. 13-13]. And counsel argued on appeal that the State failed to prove Petitioner's intent was to commit murder or deprive Mr. Gaspar of the contents of his vehicle [*See* Doc. 13-16 at 14, 15]. Nonetheless, both the jury and appellate court rejected Petitioner's arguments and version of events. Accordingly, the Court finds that Petitioner has

30

otherwise failed to show that these defaulted claims have merit, and he is not entitled to habeas relief as to these claims.

### 2. Petitioner's Absence During Sentencing

Petitioner argues that trial counsel was ineffective for not requesting that Petitioner be present when his sentence was imposed, and that appellate counsel was ineffective by not arguing on appeal that his absence during sentencing was a due process violation [Doc. 1 at 13-14; Doc. 2 at 41–42]. Applying *Strickland*, the TCCA rejected this claim on post-conviction appeal. *Flemming II*, 2022 WL 17590861, at *4, 5–6. Specifically, the TCCA found:

> The Petitioner asserts that trial counsel was ineffective for failing to request the presence of the Petitioner and to object to the absence of the Petitioner when the written sentencing order was entered. The Petitioner argues that had he been present at the imposition of his sentence, his sentence might have been less lengthy. The Petitioner also claims that counsel failed to object to the delay in the imposition of his sentence or to argue the issue on appeal.

> The Petitioner's testimony at the post-conviction hearing was his only evidence for the deficiency claim and for the claim that the Petitioner's absence at the imposition of the sentence prejudiced him. The Petitioner claimed that if he had been present at the imposition of the sentence, the trial court would have been able to see his remorse and, in turn, might have sentenced him leniently. However, the record reflects that the Petitioner was afforded the opportunity to make a statement in the presentence report and at the sentencing hearing.

> The record reflects that sentencing was imposed by the trial court's written order, and there was no hearing at which the sentence was imposed. The trial court's order is part of this court's record in the appeal of the convictions. The order reflects that the court made factual findings to support its application of enhancement factors, the absence of mitigating factors, and the factors supporting consecutive sentencing. The Petitioner has failed to provide any evidence beyond his speculative testimony that his absence when the written order was entered prejudiced the defense and has provided no authority to support his argument. The record supports the post-conviction court's determination that nothing in the Petitioner's testimony undermines the confidence in the outcome of his trial or his sentence. The post-conviction court credited the testimony of trial and appellate counsel over that of the Petitioner and found that the Petitioner failed to prove deficiency of counsel or prejudice to the defense.

*Id.* at *5–6 (internal citation omitted).

31

The Court notes that there is no clearly established federal law providing a petitioner a due process right to "the privilege of presence [during a criminal proceeding] when presence would be useless, or the benefit but a shadow." *Snyder v. Mass.*, 291 U.S. 97, 106–07 (1934). And, as TCCA noted, Petitioner was provided an opportunity to allocute in both his presentence report and during his sentencing hearing. Thus, Petitioner was able to provide the trial court with any mitigating information that he believed relevant to his sentence prior to the imposition of sentence. *Cf. United States v. Behrens*, 375 U.S. 162, 163–64 (1963) (holding defendant had due process right to be present at modification of original, tentative oral order to present information prior to final sentencing). Moreover, it is Petitioner's sheer speculation that he might have received a lesser sentence had he been present when the sentence was actually imposed, and such speculation does not establish prejudice. *See, e.g., Miller v. Johnson*, 200 F.3d 274, (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding."); *United States v. Dominguez*, 998 F.3d 1094, 1118 (10th Cir. 2021) (finding defendant's theory of prejudice cannot be supported by "sheer speculation and conjecture") (citations omitted). And because "fairminded jurists could disagree" whether Petitioner would have received a lesser sentence had he been present during its imposition, Petitioner fails to demonstrate that the decision rejecting this claim was an unreasonable application of *Strickland*. *See, e.g., Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Additionally, the post-conviction trial court noted that appellate counsel made a reasonable strategic decision concerning which issues to raise after a months-long review of the trial record [*see* Doc. 13-22 at 49], and Petitioner fails to demonstrate that finding is unreasonable, or that

there is a reasonable probability that an appeal of this issue would have been successful. *See Strickland*, 466 U.S. at 694.

Accordingly, Petitioner has not demonstrated that the decision rejecting this claim is contrary to, or involves an unreasonable application of, *Strickland* or its progeny, or that it is based upon an unreasonable determination of facts in light of the evidence presented. Petitioner is not entitled to federal habeas relief on this claim.

### 3.    Sentencing Delay

Petitioner's final ineffective-assistance-of-counsel claim alleges that both his trial and appellate counsel provided ineffective assistance in failing to challenge the delay between the sentencing hearing and the imposition of Petitioner's sentence [Doc. 1 at 15; Doc. 2 at 8–10]. Petitioner concedes that there is no clearly established law governing the underlying due-process issue but argues that it was still ineffective not to pursue this complaint [Doc. 2 at 8–10]. The TCCA considered and rejected this claim on post-conviction appeal, finding:

> The Petitioner argues that he was prejudiced by the delay because the trial judge would have been unable to recall the statements, attitudes, and demeanor of witnesses at the sentencing hearing when it issued the sentencing order. The record reflects that the sentencing hearing was on August 18, 2016, the sentencing order was entered August 7, 2017, and the judgment was entered on August 15, 2017. As we have stated, the sentencing order contained relevant factual findings to support the sentences imposed. The Petitioner put on no proof, other than his speculation, that he was prejudiced by the delay of the order's entry.
>
> The record supports the post-conviction court's determination that the Petitioner failed to show by clear and convincing evidence that he was prejudiced by any delay in the entry of the sentencing order. The Petitioner has failed to prove deficient performance or prejudice on this issue.
>
> Regarding the Petitioner's claim that appellate counsel provided ineffective assistance because he did not raise on appeal the delay in the entry of the order, the post-conviction court found that the Petitioner suffered no prejudice. The record supports the court's determination. The Petitioner failed to establish he was prejudiced by counsel's failure to raise the delay issue on appeal. He is not entitled to relief on this issue.

33

*Flemming II*, 2022 WL 17590861, at *7.

Petitioner does not identify how the TCCA contradicted or unreasonably applied *Strickland* in rejecting this claim. And he merely speculates that he was prejudiced by the delay and failure to appeal the delay, which is insufficient to establish prejudice. *See, e.g., Strickland*, 466 U.S. at 693 (providing petitioner must "affirmatively prove prejudice"); *United States v. Tilley*, Cr. No. 6-222, Cv. No. 10-691, 2011 WL 673914, at *2 (W.D. Pa. Feb. 17, 2011) ("Speculation and conjecture are insufficient to establish prejudice."); *Carter v. McKoy*, No. 09-cv-1030(NRB), at *7 (S.D.N.Y. Aug. 9, 2010) ("Vague and conclusory allegations are not sufficient to demonstrate either that counsel was ineffective or that the petitioner suffered actual prejudice.").

Accordingly, Petitioner has not demonstrated that the decision rejecting this claim is contrary to, or involves an unreasonable application of, *Strickland* or its progeny, or that it is based upon an unreasonable determination of facts in light of the evidence presented. Petitioner is not entitled to federal habeas relief on this claim.

### D.  Ground Four

In his fourth ground for relief, Petitioner alleges that his right to due process was violated when the trial court did not thoroughly investigate an outside influence on the jury [Doc. 1 at 17; Doc. 2 at 10–11]. He claims that someone was "taking pictures or video recording" inside the courtroom "[j]ust prior to jury deliberations" [Doc. 1 at 17]. Petitioner also notes that the trial court assured the jury that the incident would be investigated, and that no juror complained about the incident on the record [*Id.*].

The record reflects that approximately one hour after jury retired for deliberations, the trial court brought the jury back into the courtroom to dismiss them for the evening [Doc. 13-13 at 97, 98]. At that time, the trial judge informed the jury that it had been apprised that an individual was

"using a camera, taking some video or something[,]" that the individual had been identified and warned, that the incident was being investigated, and that the individual would be "in big trouble" if any of the jurors' photos appeared online [*Id.* at 98–99]. When court resumed the following morning, the trial judge asked the jurors whether anyone had experienced any disturbances or been contacted [*Id.* at 101–02]. No juror gave a verbal response [*Id.* at 102]. The trial judge then informed the jury that the individual allegedly taking photos had his own case before the court, that the incident had nothing to do with Petitioner, and it advised the jury not to "connect [Petitioner] to anything that happened yesterday with the camera" [*Id.*].

Citing *Remmer v. United States*, 347 U.S. 227 (1954)[5], Petitioner believes that further investigation was needed and that he received ineffective assistance of both trial and appellate counsel when they did not raise respective challenges to this issue through objection, motion for mistrial, and appeal [*Id.*].

But Petitioner did not exhaust his underlying due-process claim to the TCCA on direct appeal [*See* Doc. 13-16]. *See Adams*, 330 F.3d 398; Tenn. S. Ct. R. 39. And State law would bar any attempt by Petitioner to litigate these allegations now. *See* Tenn. Code Ann. §§ 40-30-102(a), (c). Therefore, these allegations are technically exhausted but procedurally defaulted. *See Jones*, 696 F.3d at 483. And while Petitioner presented the post-conviction trial court with his *Strickland* claim regarding the outside influence on the jury, he did not exhaust it by presenting it to the TCCA on post-conviction appeal [Doc. 13-22 at 52–57 *with* Doc. 13-24]. Thus, Petitioner cannot rely on *Martinez* to excuse the default of his *Strickland* claims related to this incident. *See Middlebrooks*,

---

[5] *Remmer* holds that, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." 347 U.S. at 229.

843 F.3d at 1136 (finding *Martinez* "does not apply to save procedural defaults that occur in appeals from initial-review collateral proceedings").

Further, as for the *Strickland* claim regarding appellate counsel's failure to raise this issue, Petitioner alleges no cause and prejudice to excuse the default. Nevertheless, the Court notes that the post-conviction trial court determined that appellate counsel chose not to raise this issue because, after thorough review of the record, "there was not enough information . . . to allow him to argue on appeal that the trial court should have employed a different procedure as it relates to this issue" [Doc. 13-22 at 56–57]. Thus, appellate counsel made a reasonable strategic decision that is "virtually unchallengeable." *Strickland*, 466 U.S. at 689–90. Further, the post-conviction trial court decided Petitioner did not show a "reasonable probability" that the issue would have succeeded on appeal if counsel raised it [Doc. 13-22 at 57]. Those determinations are borne out by the record.

Accordingly, Petitioner has not demonstrated cause and prejudice to overcome the default of this claim, nor has he shown that a fundamental miscarriage of justice would result if the claim were not reviewed on its merits. This claim is barred from review.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). And to obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of

36

reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added). Applying this standard, the Court concludes that a COA should be denied in this case.

## V.    CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief. Therefore, the instant petition will be **DENIED**, and this action is **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

So ordered.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE